UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALTERRA EXCESS & SURPLUS
INSURANCE CO.,

        Plaintiff/Counter-Defendant,

                           Case No. 2:13-cv-11672

v.                              HONORABLE STEPHEN J. MURPHY, III

EXCEL TITLE AGENCY, LLC, EXCEL
ESCROW SERVICES, LLC, and JANEL
CHIPMAN,

        Defendants,

and

WESTERN AMERICAN PROPERTIES,
INC.,

        Defendant/Counter-Plaintiff.

_____/

**ORDER GRANTING PLAINTIFF'S MOTION**
**FOR SUMMARY JUDGMENT** (document no. 50)

The present matter arises from an insurance coverage dispute. Before the Court is

Plaintiff Alterra-Excess & Surplus Insurance Company's ("Alterra") motion for summary

judgment, and it is opposed by Defendant Western American Properties, Inc. ("WAP"). For

the following reasons, the Court will grant the motion.

**BACKGROUND**

I.    Factual and Procedural Background

WAP brought a separate action in the Court against Defendants Excel Escrow

Services, LLC ("EES") and Excel Title Agency ("ETA"), ETA's owner Janel Chipman

("Chipman"), Metro Equity Group, LLC ("MEG"), and MEG's owner Corey Howard

("Howard"). Case No. 2:10-cv-14207 ("*WAP II*"). *WAP II* arose from a real estate purchase

agreement ("Agreement") between WAP and MEG, pursuant to which MEG would acquire real estate properties and sell them to WAP for 50% of their fair market value. *See* Agreement, ECF No. 50-1. Under the Agreement, WAP would deposit 10% of the total amount in escrow with ETA for use as earnest money deposits toward the purchases. *Id.* Other investors entered into similar agreements with MEG, including Hanover Exchange ("Hanover"), Lincoln Properties of Ruston, LLC ("Lincoln"), and Mt. Tai Asset Management Corporation ("Mt. Tai"). *See* ECF Nos. 50-2, 50-3, 50-4.

After WAP's funds were allegedly transferred — without WAP's knowledge or consent — from ETA to EES, and then from EES to MEG, WAP's president James Perley ("Perley") e-mailed Howard, Chipman, and others demanding the escrowed funds be returned:

> I want you to know that unless suitable inventory or funds are returned by October 22, 2009, I will take all action available against you. There will be no extensions on the 90 days; you have to either deliver the suitable inventory or the money owed to me. This is the remaining deposit of $374,900 held by Excel Title and Escrow, and my money that was diverted to you outside of my instructions and direction of $649,800 on one occasion, and $536,446 on another separate occasion, by both Excel Title and Escrow, Janel Chipman, and Outlook Escrow, Karen Gardner. Sun [sic] of the amount owed is $1,561,146. If this does not happen by October 22, 2009, I will begin to proceed with all civil and criminal action, both state and federal against you, Metro Equity Group, . . . Excel Title and Escrow, Janel Chipman, . . . Outlook Escrow, and Karen Gardner among others.

E-mail, ECF No. 13. Perley sent the e-mail on July 28, 2009. *Id.*

On October 20, 2010, WAP filed the *WAP II* complaint, alleging breach of agreement, breach of contract, negligence, breach of duty, and conversion. *See WAP II* Compl., ECF No. 50-25. Before WAP initiated *WAP II*, each individual investor had filed a lawsuit in the Eastern District of Michigan against MEG and Howard that contained similar allegations. *Compare* Complaints, Case Nos. 2:08-cv-14791 (filed 11/14/08), 2:08-cv-14897 (filed

2

11/23/08), and 2:09-cv-10685 (filed 2/24/2009) *with* Case No. 2:10-cv-14207 (filed 10/20/2010). On November 12, 2012, the Court entered judgment in WAP's favor and against EES and ETA, jointly and severally, in the amount of $1,546,986 plus post-judgment interest. Judgment, No. 2:10-cv-14207, ECF No. 33.

Alterra issued a Title Agents, Abstractors and Escrow Agents Professional Liability Insurance Policy ("the Policy") to ETA that addressed amounts relevant to the *WAP II* case up to $1,000,000. *See* Policy, ECF No. 50-33. A writ of garnishment issued against Alterra to collect on the *WAP II* judgment; Alterra filed a motion to dismiss it, and the Court denied the motion without prejudice to resolution of the instant case. *See* Docket, No. 2:10-cv-14207, ECF Nos. 36, 38, 44. A month later, Alterra filed the instant complaint for a declaratory judgment that the Policy should be rescinded and that it had no duty to indemnify ETA or any other party for the *WAP II* judgment. Compl., No. 2:13-cv-11672, ECF No. 1. WAP filed counterclaims for breach of contract and declaratory judgment, and the Court dismissed the breach of contract counterclaim on January 21, 2014. ECF Nos. 7, 31.

A protracted discovery period followed and included numerous disputes, two stipulated scheduling extensions, and one Court-ordered extension that set discovery and dispositive motion deadlines at October 15, 2015 and November 15, 2015, respectively, along with disallowance of any further extensions. *See* ECF No. 40. Alterra filed the instant motion on November 15, 2015, but discovery disputes continued into and through June 2016. In an order resolving the discovery disputes, the Court gave Alterra an opportunity to supplement its summary judgment motion by August 26, 2016. *See* Order, ECF No. 64. Having received no additional briefing, the Court will now address the motion.

3

II.    The Policy

The Policy provides "claims-made" coverage that — in contrast to occurrence coverage — indemnifies an insured for any claims made against him during the policy period, subject to certain restrictions. The Policy period ran from April 10, 2010 to April 10, 2011, and the "Retroactive Date" was set at February 15, 2006. Policy 1, ECF No. 50-33. After the Policy expired, Alterra renewed the policy for April 10, 2011 to April 10, 2012. Renewal, ECF No. 53-4. ETA tendered the *WAP II* complaint to Alterra in an e-mail dated April 4, 2011. E-mail, ECF No. 53-5. The next day, Alterra acknowledged receipt and issued a reservation of rights letter. Letter, ECF No. 53-6. The relevant provisions of the Policy and Application for the Policy are provided below.

Preamble:

In consideration of payment of the premium, and in reliance upon the statements made in the Application and its attachments and any materials submitted therewith, all of which are made a part hereof, and subject to the Declarations and all the terms and conditions of this Policy, including any endorsement hereto, we agree with you as follows . . .

Section I. 1. a. ("Insuring Clause"):

We shall pay on behalf of the "Insured" those sums in excess of the deductible that the "Insured" becomes legally obligated to pay as "Damages" and "Claims Expenses" as a result of a "Claim" first made against the "Insured" and reported to us in writing during the "Policy Period" or "Extended Reporting Period" by reason of a "Wrongful Act" in the performance of or failure to perform "Professional Services" by the "Insured" or by any other person or entity for whom the "Insured" is legally liable. The "Wrongful Acts" must have been committed on or subsequent to the "Retroactive Date" specified in the Declarations and before the end of the "Policy Period".

Section II. ("Definitions"):

B.    "Claim" means a written demand for monetary damages arising out of or resulting from the performance or failure to perform 'Professional Services.'"

4

\*        \*        \*

I.    "Professional Services" means only those services performed by any "Insured" for others for a fee in any of the following capacities:

\*        \*        \*

(4) Escrow Agent;

\*        \*        \*

L.    "Related Wrongful Acts" means "all 'Wrongful Acts' that have as a common nexus any fact, circumstance, situation, event, transaction cause or series of casually [sic] connected facts, circumstances, situations, events, transactions or causes."

\*        \*        \*

O.    "Wrongful Act" means "any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty in performing of or failure to perform 'Professional Services.'"

Section III. a. (1)–(3) ("Known Circumstances Exclusion"):

This Policy does not apply to any "Claim" against the "Insured":

a.    Based on or directly or indirectly arising out of:

(1)    A "Professional Service" performed and those services that should have been performed or were omitted prior to the effective date of the Policy if any "Insured' knew or could have reasonably foreseen that the "Professional Service" could give rise to a "Claim";

(2)    Any common fact, circumstance, transaction advice or decision involved in a "Professional Service" reported as a "Claim" or potential "Claim" under any prior Policy; or

(3)    Any "Claim", suit, act, error or omission disclosed in the application for this Policy.

Section VII.6. ("Conditions"):

Representations

By accepting this Policy, you agree:

A.    The statements in the applications are accurate and complete;

B.    Those statements are material representations you made to us; and

5

C.    We have issued this Policy in reliance upon your representations.

The "Application for Title Agents, Abstractors and Escrow Agents Errors and Omissions Liability Insurance" included the following three questions under "Loss History":

28.    Has the Applicant or any prospective Insured been involved in any criminal action or litigation in the past three (3) years? If "Yes", please provide a written narrative for each circumstance.

*        *        *

30.    During the past three (3) years, has any professional liability claim or suit ever been made against any Applicant or prospective Insured? If "Yes", you must complete the attached claims addendum for each claim or suit.

31.    Does the Applicant or any prospective Insured know of any circumstances, acts, errors or omissions that could result in a professional liability claim against the Applicant? If "Yes", you must complete the attached claims addendum for each circumstance.

Policy 24, Application, ECF No. 50-33. ETA answered "Yes" to questions 28 and 30, and

"No" to question 31. The Application goes on to state:

FOR NEW BUSINESS, IT IS AGREED THAT IF ANY FOR THE RESPONSES TO QUESTIONS 28 THRU 31 ARE "YES", ANY CLAIM FOR CIRCUMSTANCE THAT COULD RESULT IN A CLAIM WILL BE EXCLUDED FROM THE PROPOSED COVERAGE.

BY SIGNING THIS APPLICATION BELOW, THE APPLICANT AGREES THAT AFTER INQUIRY OF ALL PROSPECTIVE INSUREDS, NO PERSON PROPOSED FOR COVERAGE IS AWARE OF ANY FACT OR CIRCUMSTANCE WHICH REASONABLY MIGHT GIVE RISE TO A FUTURE CLAIM THAT WOULD FALL WITHIN THE SCOPE OF THE PROPOSED COVERAGE.

*Id.* The Claims Addendum — which had to be filled out for affirmative responses to

questions 28 and 30 — required ETA to "[d]escribe the claim, the alleged wrongful act or

omission and the event that led to the claim." *Id.* at 26. ETA wrote the following in the field

provided: "[A] lien popped up after closing on a condo for mold. Condo assoc [sic] was

6

foreclosing. Underwriter paid lien so lender would still have 1st lien position, seller did not disclose but new [sic]." *Id.* May 2009 was listed as the date of the alleged wrongful act or omission, date of the claim, and it was also the date ETA reported the claim to the Professional Liability insurer.

## STANDARD OF REVIEW

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" for purposes of summary judgment if proof of that fact would establish or refute an essential element of the cause of action or defense. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). A dispute over material facts is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). The Court must take care, in evaluating the motion, not to make judgments on the quality of the evidence, because the purpose of summary judgment is to determine whether a triable claim exists. *Doe v. Metro. Nashville Pub. Schs.*, 133 F.3d 384, 387 (6th Cir. 1998) ("[W]eigh[ing] the evidence . . . is never appropriate at the summary judgment stage.").

## DISCUSSION

Alterra argues in its motion for summary judgment that: (1) the Court in *WAP II* lacked subject matter jurisdiction, and its judgment did not trigger the Policy; (2) the *WAP II* claim is barred by the Policy's Claims-Made Policy; (3) the *WAP II* claim is barred by the Policy's

7

Known Circumstances Exclusion; (4) the *WAP II* claim is barred by the Policy's Prior and Pending Litigation Exclusion; and (5) the Policy is void ab initio based on ETA's misrepresentations in the Policy application. Mot. Summ. J., ECF No. 50. The Court need only address the first and third arguments.

I.   Subject Matter Jurisdiction in *WAP II*

Alterra claims that the Court lacked subject matter jurisdiction to hear *WAP II* due to a previously filed federal case ("*WAP I*"), and that the Policy has not been triggered. Mot. Summ. J. 20–21, ECF No. 50. In *WAP I*, WAP and WAP's president James M. Perley ("Perley") sued Howard, EES, Chipman, Outlook Escrow, Inc. ("Outlook"), and former Outlook employee Karen Gardner ("Gardner"). WAP I Compl., ECF No. 50-23. They alleged state law breach of contract, fraud, conspiracy, breach of fiduciary obligation, and conversion claims. The court dismissed the case sua sponte for lack of diversity jurisdiction because WAP and Outlook were both California-based corporations. The court concluded that the defect could not be cured by an amendment "to drop [the] nondiverse party in order to preserve statutory jurisdiction." Order 2, ECF No. 50-26 (citing *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830–31 (1989)). Neither WAP nor Perley contested or appealed the dismissal.

"[T]he issue of subject matter jurisdiction is threshold to the Court's authority to invoke its jurisdiction to proceed with an action." *Stone v. William Beaumont Hosp.*, 782 F.2d 609, 613 n.3 (6th Cir. 1986). Although a dismissal for lack of jurisdiction does not operate as an adjudication on the merits, *see* Fed. R. Civ. P. 41(b)*,* Alterra claims the jurisdictional ruling in *WAP I* "precluded [WAP] from bringing a subsequent suit, asserting essentially the same claims, citing the same jurisdictional basis." Mot. Summ. J. 22, ECF No. 50 (quoting *Shaw*

8

*v. Merritt-Chapman & Scott Corp.*, 554 F.2d 786, 789 (6th Cir. 1977)).

Alterra's reliance on *Shaw* is misguided. In *Shaw*, the Sixth Circuit affirmed that (1) the plaintiffs' jurisdictional assertion was factually incorrect; and (2) the plaintiffs raised the exact same incorrect assertion in a subsequent case. Here, the jurisdictional assertion in *WAP II* is both factually correct (because diversity exists), and factually different than the assertion in *WAP I* (because Outlook is not a named defendant). Thus, the Court in *WAP II* did not relitigate the same jurisdictional question as the court in *WAP I*. Put differently, it is not the case that WAP and Perley's general *ability* to file another diversity suit cannot be relitigated; rather, it is their ability to file another federal case asserting diversity jurisdiction *against Outlook* — the presence and corporate citizenship of whom has previously been determined to destroy diversity — that cannot be relitigated. *Compare Mann v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 488 F.2d 75, 76 (5th Cir. 1973) (holding that dismissal of suit for failing to properly allege diversity did not bar a new suit properly pleading diversity sufficient to establish jurisdiction) *with Napper v. Anderson, Henley, Shields, Bradford & Pritchard*, 500 F.2d 634, 636–37 (5th Cir. 1974) (holding that determination of the fact of the parties' citizenship in an earlier case precluded relitigation of that fact in a later attempt to invoke diversity jurisdiction against the same parties); *see also GAF Corp. v. United States*, 818 F.2d 901, 912–13 (D.C. Cir. 1987) ("The judgment ordering dismissal, will . . . preclude relitigation of the *precise issue of jurisdiction* that led to the initial dismissal. A claim of jurisdiction is not precluded if, however, in the interim subsequent to the initial dismissal there are developments tending to 'cure' the jurisdictional deficiency identified in the first suit.") (emphasis added). Because Outlook is not a defendant here, the Court's jurisdictional determination in *WAP II* was both permissible and

9

proper. Thus, the *WAP I* dismissal did not preclude the Court from deciding *WAP II*.

II.   Known Circumstances Exclusion

Alterra contends that the Perley E-mail and the numerous lawsuits filed against Chipman and ETA[1] prior to the inception of the Policy leave no doubt that Chipman — as ETA's sole owner and member — knew or could have reasonably foreseen that a Professional Service she performed could give rise to a Claim, and that the Policy's "Known Circumstances" exclusion therefore relieves Alterra from its duty to indemnify. Mot. Summ. J. 25, ECF No. 50.

The parties agree that Alterra's summary judgment motion is governed by Michigan law on the construction of insurance policies, which treats and interprets an insurance contract like any other written contract. *Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 942 (6th Cir. 1993) (citation omitted). The Court must enforce the policy's "ordinary and plain meaning," *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 47 (2003), and "read[ ] the agreement as a whole," *Old Kent Bank v. Sobczak*, 243 Mich. App. 57, 63 (2000). "[I]f contractual language is clear, construction of the contract is a question of law for the court." *Meagher v. Wayne State Univ.*, 222 Mich. App. 700, 721 (1997). The question of whether the contract is ambiguous or not is also a question of law. *Klapp v. United Ins. Group*

---

[1] WAP asserts that Alterra's argument on the issue should not be considered because it relies solely on the substantive claims and on case-specific factual allegations of Lincoln, Hanover, and Mt. Tai in the pleadings or exhibits for the other cases; and because it is being offered to prove the truth that claims have been asserted against ETA that are "substantively related" to WAP's claims, it is barred as inadmissible hearsay. Resp. 17–18, ECF No. 53. Alterra counters by correctly stating that those complaints are not offered to prove the truth of the allegations, but rather only that the allegations were made, and thus are not hearsay. Reply 4–5, ECF No. 54 (citing *United States v. Boyd*, 640 F.3d 657, 663–64 (6th Cir. 2011) and *Biegas v. Wuickway Carriers, Inc.*, 573 F.3d 365, 378 (6th Cir. 2009)).

*Agency, Inc.*, 468 Mich. 459, 463 (2003).

When construing insurance contracts, Michigan courts "consistently adhere[ ] to the general rule . . . that an ambiguous provision in an insurance contract must be construed against the drafting insurer and in favor of the insured." *Clevenger v. Allstate Ins. Co.*, 443 Mich. 646, 654 (1993). Nonetheless, a term or policy is considered ambiguous only "if it is susceptible to two different reasonable interpretations," *Comerica Bank*, 3 F.3d at 942 (citation omitted), and courts may not "create an ambiguity in an otherwise clear policy." *Fire Ins. Exchange v. Diehl*, 450 Mich. 678, 687 (1996).

"The fact that a policy does not define a relevant term does not render the policy ambiguous." *Doeren Mayhew & Co., P.C. v. CPA Mut. Ins. Co. of Am. Risk Retention Grp.*, 633 F. Supp. 2d 434, 440 (E.D. Mich. 2007) (quoting *Henderson v. State Farm Fire & Cas. Co.*, 460 Mich. 348, 354 (1999)). Instead, a court "must interpret the terms of the contract in accordance with their commonly used meanings." *Id.* "[I]nsurance exclusion clauses are construed strictly and narrowly." *Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 28 F. Supp. 2d 440, 445 (E.D. Mich. 1998) (citation omitted). Even so, "courts will enforce clear and unambiguous exclusions in insurance policies." *Tenneco Inc. v. Amerisure Mut. Ins. Co.*, 281 Mich. App. 429, 467 (2008).

The Policy's Known Circumstances Exclusion is clear and unambiguous, and applies here even when construed strictly and narrowly. In his July 28, 2009 e-mail, Perley clearly stated that he would "begin to proceed with all civil and criminal action, both state and federal against [Howard], Metro Equity Group, . . . Excel Title and Escrow, [and] Janel Chipman" if he did not receive money owed to him. Specifically, Perley demanded "the remaining deposit of $374,900 held by Excel Title and Escrow, and my money that was

11

diverted to [Howard] outside of my instructions . . . by both Excel Title and Escrow, Janel Chipman," and others. E-mail, ECF No. 50-13. Other investors made similar allegations in three lawsuits filed against ETA and Chipman before the start of the Policy period. *See* Case Nos. 2:08-cv-14791 (filed 11/14/08), 2:08-cv-14897 (filed 11/23/08), and 2:09-cv-10685 (filed 2/24/2009). And the very allegations in Perley's E-mail formed the basis for the successful claims filed in *WAP II* on October 20, 2010. *See* Case No. 2:10-cv-14207. The combination of those circumstances shows that Chipman had subjective knowledge that a Claim might be filed against ETA, or that she could have reasonably foreseen a Claim. No reasonable juror could find otherwise. A reasonable escrow agent functioning as the sole owner and member of a company would have concluded that the events indicated a strong likelihood that a future Claim would be filed against her company.

WAP contends that Chipman and/or ETA subjectively did not believe, or have reason to believe, that they would be subject to a Claim based on (1) ETA's response to Question 31 in the Policy Application, and (2) the fact that the "Professional Service" here was simply that ETA transferred funds to EES per the advice of its underwriter. But the standard the Court applies is whether a reasonable juror could find that a professional in the party's position could have reasonably foreseen a future claim, and not whether a reasonable juror could find that the party was subjectively reasonable in claiming that she could not have foreseen a future claim.[2] *See Thomson v. Hartford Cas. Ins. Co.*, No. 13-10863, at 8–11

---

[2] *Maxum Indem. Co. v. Drive W. Ins. Servs., Inc.*, is an unpublished Sixth Circuit case in which the court analyzed whether the language of a similar known-circumstances exclusion applies "only to those wrongful acts that [the insured] believed, prior to coverage, would turn into claims or whether it applies to claims that [the insured] should have known would do so." 630 F. App'x 599, 605 (6th Cir. 2015). In finding that the insurer failed to show that the claims were excluded by the insured's prior knowledge, the court relied on (1) the policy application in which the insured represented that it knew of no potential

(E.D. Mich. March 31, 2015) (Murphy, J.), *aff'd*, 2016 WL 4036403 (6th Cir. July 28, 2016) ("Any reasonable lawyer would have known that this course of events bore the seeds of a malpractice claim."); *Comerica Bank*, 3 F.3d at 945 ("[N]o reasonable juror could find that Comerica could not have reasonably foreseen that at some point in the future it would be subject to suit by the beneficiaries for this misconduct."); *Sigma Fin. Corp. v. Am. Int'l Specialty Lines Ins. Co.*, 200 F. Supp. 2d 710, 718 n.6 (E.D. Mich. 2002) ("The correspondence between Plaintiff and Defendant, during the 1998–99 policy period, clearly indicates that Sigma could have reasonably foreseen that the separate sales of MCA securities 'could' lead to a claim or lawsuit."); *McKeen v. Cont'l Cas. Co.*, No. 2:10-cv-10624, 2011 WL 3839803, at *7 (E.D. Mich. Aug. 30, 2011) (finding that the insured's subjective belief was irrelevant for purposes of determining the applicability of the known circumstances exclusion, and that "[a] reasonable jury would find that [the insured's] subjective belief is unreasonable based on the undisputed facts").

Accordingly, the Known Circumstances exclusion applies, and Alterra is correspondingly relieved from its duty to indemnify. The Court will grant Alterra's motion for summary judgment.

IV.   WAP's Remaining Counterclaim

Although the Court denied WAP's breach of counterclaim on January 21, 2014, WAP's declaratory judgment counterclaim remains. In it, WAP requests a declaratory

---

claims; and (2) letters from potential claimants that did not mention any potential demands for monetary relief or lawsuits for damages. *Id.* at 606. Although somewhat persuasive, *Maxum* is easily distinguishable from the present case: Perley's e-mail mentioned potential demands for monetary relief and lawsuits for damages. Accordingly, the Court declines to employ its reasoning, and instead relies on the Sixth Circuit's affirmance in *Thomson*, and its published decision in *Comerica Bank*.

judgment that the Policy provides coverage for some or all of the claims in *WAP I* and that Alterra breached its duties to defend and indemnify, and sought any other relief due. Counterclaim 13–14, ECF No. 7. Because the Court will grant Alterra's motion for summary judgment, WAP's counterclaim necessarily fails, and will be dismissed accordingly.

## ORDER

**WHEREFORE**, it is hereby **ORDERED** that Alterra's Motion for Summary Judgment (document no. 50) is **GRANTED**.

**IT IS FURTHER ORDERED** that Count II of WAP's counterclaim (document no. 7) is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the case is **DISMISSED WITH PREJUDICE**.

**SO ORDERED**.


s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: October 31, 2016

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on October 31, 2016, by electronic and/or ordinary mail.

s/David P. Parker
Case Manager